201 F.Supp.2d 976 (2001)
Karen S. RASOR, Plaintiff,
v.
Larry G. MASSANARI,[1] Acting Commissioner of Social Security, Defendant.
No. 1:00CV 77 DDN.
United States District Court, E.D. Missouri, Southeastern Division.
August 30, 2001.
*978 Samuel M. Coring, Reynolds And Gold, Springfield, MO, for plaintiff.
Nicholas P. Llewellyn, Office Of U.S. Attorney, St. Louis, MO, for defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying plaintiff's application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq. Oral argument was heard on June 21, 2001. The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).
Karen Rasor filed an application for disability insurance benefits on April 20, 1998, alleging disability due to pulmonary fibrosis with an onset date of April 2, 1994. (Tr. 81-85). Her application was denied initially and on reconsideration. (Tr. 53-54, 66-69, 71-73a).
Following a hearing on December 8, 1998, an administrative law judge (ALJ) found that plaintiff was not disabled under *979 the Act at a time when she met the insured status requirements and denied benefits. (Tr. 12-20). Additional evidence was submitted to the Appeals Council (Tr. 318-43), but the Council denied plaintiff's request for review of the ALJ's determination. (Tr. 3-5). Thus, the decision of the ALJ becomes the final decision of the Commissioner.
Relevant to the issues presented herein, the ALJ determined in her decision of January 29, 1999, that:
1. Plaintiff met the disability insured status requirements of the Social Security Act on April 2, 1994, the date she stated she became unable to work, and continued to meet them through September 30, 1996.
2. Plaintiff has not engaged in substantial gainful activity since April 2, 1994.
3. The medical evidence establishes that prior to September 30, 1996, plaintiff had allergic sinusitis "and/or" allergic bronchitis, but that she did not have an impairment or combination of impairments listed in, or medically equivalent to one listed in the Commissioner's List of Disabling Impairments.
4. Plaintiff's allegations and testimony of symptoms precluding the full range of sedentary work prior to September 30, 1996, were not fully credible to the extent alleged for the reason that they are not fully supported by, or consistent with, the medical and other evidence.
5. Plaintiff had no nonexertional limitations and had the residual functional capacity to perform the physical exertion requirements of work, including the full range of sedentary work except for prolonged standing and walking and lifting more than ten pounds.
6. Plaintiff was unable to perform her past relevant work.
7. Guideline Rules 201.27 and 201.28 direct a conclusion that considering the plaintiff's residual functional capacity, age, education, and work experience, she was not disabled prior to September 30, 1996.
8. Consequently, plaintiff was not disabled under the Act.
(Tr. 18-19).
The court must affirm findings of the ALJ that are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir.1998). Substantial evidence is evidence of sufficient quality that a reasonable person would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000). In reviewing the record, the court may not make its own findings of fact or substitute its own judgment for that of the Commissioner. Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir.1992). Nevertheless, when the court reviews the record for substantial evidence, it must review the entire record and consider whatever detracts from the weight of the evidence invoked by the ALJ. Singh, 222 F.3d at 451; Piercy v. Bowen, 835 F.2d 190, 191 (8th Cir.1987). See also Wilcutts v. Apfel, 143 F.3d at 1136-37. Thus, substantial evidence on the record as a whole requires the court to "take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts, 143 F.3d at 1136 (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir.1987)). However, reversal is not proper just because there is substantial evidence which might have supported an opposite result. Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir.1992).

*980 Evidence Before the ALJ

At the hearing conducted on December 8, 1998, plaintiff complained of disability from pulmonary fibrosis and bone pain in her legs. She testified that her chief complaints were not having "enough wind, enough energy" and bone pain in her legs. (Tr. 34). She estimated that the problems started in about 1993 with episodes of uncontrollable coughing. (Tr. 36, 38). She was diagnosed with pulmonary fibrosis in 1995. (Tr. 37). She testified that she stopped working after the birth of her youngest daughter in 1994 and was a homemaker. (Tr. 25-26, 37). She has three children ages 3 to 14 and is married. (Tr. 32). She has a high school education. (Tr. 33).
Plaintiff testified that she worked in a floral shop from approximately January 1998 through April 1998 but she had to quit because she was so tired. She worked every other day and it would take her a day to recuperate from a day at work. (Tr. 29). She said that the work was hard and physical; it required a lot of lifting and carrying. (Tr. 30, 47). She was able to keep pace with the other employees, but she had "no energy to spare." (Tr. 46). She never imagined that this job involved so much physical work when she took it. (Tr. 47). She had to quit when she could no longer speak above a whisper. Id. Additionally, mold and aerosol sprays used at her place of employment aggravated her condition. (Tr. 33).
She also testified that, over the course of her working life, she has worked in department stores as Christmas help, as a factory worker, as a cashier, as a stocker, and as a sales worker. (Tr. 48). She testified that she did not believe she could currently work as a cashier, because standing in one spot "kills [her] legs." (Tr. 48). Also, she would need oxygen on a job because she never knows if she is going to run into allergens, strong lingering perfumes or other odors, dust, etc. (Tr. 48).
Plaintiff further testified that, although she was on oxygen, she does not need it continuously, but only upon exertion. (Tr. 31, 34-35). For instance, she uses oxygen six to eight hours per day, if she is doing housework or "just moving," but does not use it if she is just sitting. (Tr. 41). She was no longer a smoker, having quit approximately five months before the hearing. She acknowledged that her doctor told her in 1998 that, if she quit smoking, her condition would hopefully improve, although she pointed out that her condition was not caused by smoking. (Tr. 37-38). She testified that she becomes short of breath with any physical activity which, in turn, leads to fatigue. (Tr. 34-35).
With respect to her bone pain, plaintiff testified that her legs have hurt for years and when she performs "a lot of physical exertion they really hurt." (Tr. 34). She has never been tested to see whether she has a diagnosable problem with her legs. (Tr. 44). However, she testified she still pretty much did what she wanted despite the pain, and she could live with it. Id.
She also testified that she has chest pain weekly due to her coughing. (Tr. 44). However, she can obtain relief with cough syrup, cough drops, and steam. But cold, damp air aggravates her condition making her chest hurt and causing more coughing. (Tr. 44-45, 50).
Plaintiff also testified that she had been treated for depression. (Tr. 35).
With respect to her daily activities, she testified that when her youngest child was born, she had to take care of the baby, because there was no one else, although she could not do so as well as she would have liked. (Tr. 39). Additionally, she took care of her two other children and mowed the lawn. However, since the birth *981 of her youngest daughter in 1994, she does not do as much as she once did and her children and husband provide more help. (Tr. 39-40). She is no longer able to mow the lawn. (Tr. 50). She still does some housework, but does not clean the bathroom or oven, due to the fumes from the cleaners. (Tr. 40). Her husband does the shopping and some cooking. (Tr. 43). She sweeps the kitchen floor at a very slow pace while using oxygen. (Tr. 46). She vacuums in short intervals, and her children help. (Tr. 50). Her hobbies previously included gardening and painting, but she has not been able to engage in these for two or three years. (Tr. 42, 50).
She estimated that she could walk one mile on a level surface, at a very slow pace. (Tr. 43). Carrying a purse "wears [her] out." (Tr. 43). She can sit as long as long as she is not engaged in a "big discussion" and as long as there is no "turmoil." She can stand without breathing problems, but standing in one spot for a long period of time hurts her legs "very badly." (Tr. 44). Climbing stairs makes her breathless. (Tr. 46).
As to her prognosis, plaintiff testified that she has been told there are a number of conditions associated with her problems such as bone cysts, "malignant lymph gland sickness," and diabetes, and that she may require a lung transplant. (Tr. 38).
The medical records before the ALJ establish that in December 1993 plaintiff sought treatment for depression and mood swings. Her lungs were clear. (Tr. 317). She was prescribed Aldactone. (Tr. 317).
In March 1994, when she first presented for prenatal care, her lungs were clear. She was advised to stop smoking. (Tr. 315).
In May 1994, plaintiff was seen for headaches and nasal congestion. Again, her lungs were clear. She was diagnosed with chronic rhinitis and possibly sinusitis, and she was prescribed an antibiotic and an over-the-counter decongestant. (Tr. 314).
Preterm labor was delayed on September 15, 1994. (Tr. 227-28). Although she was a smoker, she stated she had "cut way back." (Tr. 244). She subsequently delivered the baby. At that time, her chest and lungs were clear, although it was noted that she continued to smoke one or one-half pack per day. (Tr. 187, 198, 222).
In November 1994, she was seen for a post-partum examination which revealed no complaints or problems. (Tr. 313).
On December 28, 1994, plaintiff was seen for a cough lasting approximately one month but with recently developing pain on deep breathing and with frequent coughing. (Tr. 312). Her lungs were clear. Bronchitis and pleurisy were diagnosed. (Tr. at 312).
On February 27, 1995, she was seen for complaints of sinus drainage, throat irritation, and a mild non-productive cough. Her lungs were clear. It was noted that she then smoked one pack of cigarettes per day. Sinusitis was diagnosed. (Tr. 311).
Similarly, she was seen on March 30, 1995, upon complaints of congestion and sinus drainage; she also complained of a cough of several days duration. She was slightly hoarse and had a slight rhonchus cough. Bronchitis and laryngitis were diagnosed and an antibiotic and decongestant were prescribed. (Tr. 310).
On April 26, 1995, she was seen for complaints of cough and congestion of three months duration with no relief from antibiotics. She continued to smoke. She described her cough as making her feel "like her uterus is about to fall out." Her lungs were clear. A chest x-ray showed some interstitial lung disease. She was diagnosed with "most likely interstitial *982 lung disease, really questionable etiology" and depression. An antidepressant was prescribed and she was referred to a pulmonologist. (Tr. 309).
On May 4, 1995, upon referral, she was seen by Dr. Mark Sifford, M.D., for complaints of a productive cough which had lasted five months. She complained of coughing day and night and of decreased appetite and feeling run down. She felt much worse than before. She complained of shortness of breath and increased coughing upon exertion or anxiety. She was hoarse. She reported that her farm house and surrounding land and the chemicals used on it aggravated her symptoms. She had foamy, white post-nasal drainage. Her lungs were clear. The prior chest x-ray showed five lobe interstitial alveolar infiltrates.
Dr. Sifford believed that her cough and shortness of breath were more likely due to allergic sinusitis or allergic bronchitis than to the interstitial lung disease. He believed that the chest x-ray represented interstitial fibrosis which may or may not be contributing to her condition. He based this opinion on her essentially normal spirometry test results. Rather than immediately proceeding with a lung biopsy, it was determined to vigorously treat her for allergies, and. if she was not better in a short time, to reevaluate treatment. (Tr. 296-97).
Plaintiff was next seen on September 9, 1995, for complaints of nasal discharge and productive cough over several days. An occasional expiratory wheeze was noted. The diagnosis was bronchitis and sinusitis. (Tr. 308).
The record shows that the next medical treatment was sought on June 11, 1996, for complaints of cough and congestion. Rhonchi in the chest were noted, as well "some" bronchitis and "some" laryngitis. She continued to smoke and was asked to stop. (Tr. 307).
In November 1996, after the expiration of her insured status, plaintiff was seen with complaints of chest congestion, irritation in her chest, and some facial swelling and drainage from her teeth, for which she had seen a dentist. The lungs sounded clear, and on physical examination she appeared to be in "no real distress." Dental abscesses as well as mild bronchitis were diagnosed. (Tr. 306).
On December 17, 1996, at a well woman examination, plaintiff reported weakness, an abscessed tooth, and coughing, but was otherwise doing "really quite well." Her lungs were clear. The diagnosis was an abscessed tooth and an "otherwise essentially normal exam." (Tr. 305).
On January 26, 1997, plaintiff sought treatment for sinus pressure and sinus congestion. Her lungs were clear. The diagnosis was sinusitis, an antibiotic was prescribed, and plaintiff was directed to return, if she did not improve. (Tr. 304).
Plaintiff was next seen on February 5, 1997, for complaints of numbness and tingling in her left upper hand and left knee. She complained of feeling "terribly fatigued" with "just no energy whatsoever," as well as cold intolerance. Her lungs were clear. There was subjective numbness over her knee. An x-ray of her left knee was negative. The diagnoses were left arm numbness of questionable etiology, "mild fatigue with no really [sic] evidence of this," and numbness of left knee. The plan was to obtain a neurological consultation. (Tr. 302-03). Medical progress notes indicate that she did not keep her appointment with the neurologist. (Tr. 301).
On June 30, 1997, plaintiff sought treatment for complaints of "just feeling really stressed out" and anxiety during the past *983 several months. Her lungs were clear. The diagnosis was anxiety; an anti-anxiety medication and stress reduction were prescribed. (Tr. 301). Upon follow-up in July 1997, it was noted that she was "doing reasonably well" but was still feeling terribly stressed out. She reported that the medication was helping "a little bit." She appeared somewhat anxious and an antidepressant was added to the anti-anxiety medication. (Tr. 300).
On October 19, 1997, she reported possible poison ivy and coughing of two months duration for which she sought treatment. Although the notes are fairly illegible, it appears she had a severe cough. She reported smoking one pack of cigarettes per day. It appears that a diagnosis was chronic bronchitis and she was told to stop smoking. (Tr. 184, 299).
On April 16, 1998, David Pfefferkorn, M.D., saw plaintiff for complaints of neck pain, coughing, and hoarseness. It was noted that she was employed in a floral shop. She described coughing fits and episodes of coughing upon walking. She described having a terrible cough the winter after the birth of her youngest child. She stated that she had been diagnosed with pulmonary fibrosis. She stated that she smoked a pack of cigarettes per day. During the examination, at the end of a sentence she would have to stop and cough. Her voice was quite hoarse, but her "chest was amazingly clear." However, upon x-ray, "surprisingly, there [was] extensive pulmonary fibrosis present." The plan was to refer her to Dr. Ahmad and to obtain prior x-rays for comparison. The doctor "impressed upon her the absolute importance of cessation of smoking." Zyban was prescribed. (Tr. 292-94).
Dr. Shahzad Ahmad, M.D., in consultation, examined plaintiff for an evaluation of "pulmonary fibrosis" on April 30, 1998. She stated that she had smoked one and one-half packs of cigarettes per day since age 18. She complained that after the birth of her last child she developed a nonproductive cough that continues. She correlated this event to the discovery of extensive mold in their home. She also complained of sinusitis and post-nasal drip. She also related a past history of cough associated with dust in a manufacturing plant in which she worked and cough associated with exposure to lacquer in another manufacturing plant where she was employed. She stated that she had worked in a clothing department store in November 1997, immediately prior to working at the floral shop. She described her work at the floral shop as quite physically demanding and that she was very tired at the end of the day.
Plaintiff complained of shortness of breath upon exertion of three to four years duration. She additionally stated that she becomes short of breath in doing her housework, especially vacuuming, which can take her all day. She estimated that she could walk one-half mile and is able to do all of her housework. She stated that exposure to mold and hair spray produces chest tightness and breathing difficulty but denied any problem from perfume or exposure to cold air. She complained of chronic allergic sinus problems and nasal discharge. Her chest was clear. The doctor's impression was diffuse bilateral reticular nodular infiltrates, indeterminate, and chronic allergic sinusitis with post-nasal drip syndrome. Dr. Ahmad believed that a diagnosis of pulmonary fibrosis was possible, but less likely. Further tests were anticipated, including a chest CT and pulmonary function test. (Tr. 287-91).
The results of the pulmonary function tests conducted on May 1, 1998, were within normal limits but suggested borderline airflow obstruction. Diffusion capacity was moderately reduced. (Tr. 280).
*984 Also, a CT scan was taken on May 1, 1998. Bilateral reticular nodular densities were noted, with chronic changes and honeycomb appearance of both lungs due most probably to chronic exposure like pneumoconiosis. (Tr. 277). (See also Tr. 275-76). This CT scan was sent to the Mayo Clinic with the resulting diagnosis of pulmonary histiocytosis X.
On June 18, 1998, a closer review of the chest x-rays and CT scan suggested to Dr. Ahmad that the disease was "not far advanced." Dr. Ahmad characterized the disease as uncommon and of unclear etiology, although it is seen in many smokers. With this disease there is the possibility of spontaneous pneumothoraces,[2] bone cysts and diabetes. The disease can go into spontaneous remission or progress to end-stage fibrotic lung disease. With progression, a lung transplant may be necessary. Generally, the disease progresses with continued smoking and regresses with smoking cessation, in the opinion of Dr. Ahmad. Plaintiff indicated that she ceased smoking two weeks prior. Dr. Ahmad anticipated that plaintiff's disease would either remain stable or improve if she stopped smoking. He did not believe that she had any other systemic disease related to the histiocytosis.
Plaintiff reported shortness of breath upon vacuuming, loading the dishwasher, and carrying laundry. She could only vacuum one room at a time. She estimated she could walk four blocks at a slow pace and had trouble keeping up with her youngest daughter.
Dr. Ahmad believed that plaintiff would need supplemental oxygen when she engaged in moderate to severe exercise; oxygen was prescribed. Her lungs were clear without rales or wheezing. A chest x-ray taken on June 18, 1998, was unchanged from that taken on April 16, 1998. She complained of chronic neck pain and an x-ray was taken to rule out bone cysts which are associated with histiocytosis. (Tr. 269-74).
On June 30, 1998, plaintiff was seen by Dr. Pfefferkorn. Plaintiff complained that her symptoms had progressed to where she needed oxygen to do her housework and had frequent periods of coughing, and she was intolerant to strong smells. She stated that she had almost completely quit smoking and her physician stressed that it was imperative that she do so. (Tr. 271).
On July 20, 1998, plaintiff was seen by Dr. Ahmad. She reported not smoking for approximately one month. She estimated she could walk one-half mile at a slow pace and did most of the housework, except vacuuming. She used oxygen with more strenuous activity such as carrying groceries or laundry. She stated that she felt better and was not as fatigued using oxygen. Presently, she had a minimal cough and no wheezing. Her chest was clear. The doctor noted that the supplemental oxygen seemed to have helped and noted that she would not need it when just sitting, sleeping and slow walking. He considered her to have successfully quit smoking. The diagnosis was primary pulmonary histiocytosis X and chronic allergic sinusitis with post-nasal drip syndrome. (Tr. 269-70).
Plaintiff was seen again by Dr. Ahmad on October 12, 1998. She continued to report that she had not smoked. She reported that using oxygen at night was beneficial. She stated that she felt better than in July 1998, and estimated that she could walk the length of a football field. *985 She again reported doing most of the housework, except vacuuming. She appeared "a little stressed out." She did not have a cough. Her chest was clear without wheezing or rales. Dr. Ahmad believed her exertional dyspnea had improved and that her disease had stabilized with her stopping smoking. She was to continue using oxygen for moderate to heavy exertion and an anti-anxiety medication was prescribed. (Tr. 179-80).
Additional medical records were submitted to the Appeals Council (Tr. 5) which established that beginning in June 1999, plaintiff began chemotherapy for histiocytosis X, eosinophilic granuloma[3] with extensive lung involvement, genital involvement, and possible lymph node involvement. (Tr. 318-19). She complained of heel pain but an x-ray failed to reveal any abnormality. (Tr. 318-20).
On June 22, 1999, she was seen in follow-up of the chemotherapy. She complained of intermittent pain in her heels and left lower extremity; this was relieved with ibuprofen. She complained of depression. Chemotherapy was to continue and an anti-depressant was prescribed. (Tr. 322-23).
A CT scan on August 4, 1999, showed "nonspecific mild interstitial pulmonary prominence markedly improved from a fibronodular appearance [a]s seen on 5/01/98." (Tr. 331).
On August 5, 1999, plaintiff was again seen in follow-up of the chemotherapy. Subjectively, she was "much improved" and exercise tolerance was improved. She complained of hip pain, but x-rays showed no evidence of lesions. It was believed that she was responding well to the chemotherapy and had achieved at least partial remission. It was noted that she was still smoking. Chemotherapy was to continue. (Tr. 333-34).
Plaintiff was again seen in follow-up on August 31, 1999. She felt well without recent symptoms. Her breathing was much improved. She continued to complain of depression despite medication. She reported occasional left hip pain and left lateral chest pain of chronic origin. Her chest sounds were clear. Chemotherapy was to continue and a different anti-depressant was prescribed. (Tr. 336).
Plaintiff's list of daily activities prior to June 1996 reveal that she needed help in all household tasks except dusting, paying bills, and driving. She also indicated that she never did yard work or gardening. She stated that she received help from her husband in child care and that the children helped with vacuuming, mopping, cleaning the bathroom, changing sheets, and straightening up the house. (Tr. 101-02).
The record contains letters from a friend and a neighbor of plaintiff, attesting to the onset of plaintiff's coughing problems in 1993 and 1994. One reported that plaintiff appeared to become progressively worse and seemed weak at times. (Tr. 103). The other reported that plaintiff experienced shortness of breath and coughing fits. She had observed plaintiff take frequent rest breaks in providing care to her children and needing oxygen to do routine household tasks. (Tr. at 103-04).
The record also contains correspondence from a speech pathologist, a friend of plaintiff's. She reported that in approximately 1993 she noticed changes in the plaintiff's voice and frequent coughing and clearing of the throat "at a rate that would be considered abusive by any speech pathologist." *986 It was noted that "shortness of breath which is noted in [plaintiff's] connected utterances have accelerated and compromise her normal speech patterns. [Plaintiff] is unable to carry on a normal conversation without her connected utterances being impeded." (Tr. 267).

Discussion
The issue before the court is whether the decision of the Commissioner denying plaintiff disability insurance benefits is supported by substantial evidence. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir.2001); Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).
Plaintiff complains that the ALJ impermissibly relied upon the Guidelines in finding her not disabled and should have used a vocational expert testimony to establish whether there was other substantial gainful activity she could perform. Plaintiff further complains that the ALJ failed to fully and fairly develop the record and impermissibly substituted her own medical opinion that plaintiff did not suffer from histiocytosis X prior to September 30, 1996, the date she was last insured. Finally, plaintiff complains that the ALJ did not properly consider her subjective complaints. For the following reasons, the final decision of the Commissioner will be reversed and this matter will be remanded to the Commissioner for further proceedings.
The undersigned agrees with plaintiff that the Commissioner should have developed the record as to the probable date of onset of the histiocytosis X. To be entitled to disability insurance benefits under Title II, a claimant must meet the insured status requirements. See 42 U.S.C. §§ 416(i)(3)(B), 423(c)(1)(B); 20 C.F.R. §§ 404.130, 404.131, 404.315. If an individual is no longer insured for disability insurance benefits, the court considers the individual's medical condition on the date last insured. Long v. Chater, 108 F.3d 185, 187 (8th Cir.1997). In the instant case, plaintiff was last insured on September 30, 1996.
While the burden of establishing a disability is upon the claimant, Clark v. Shalala, 28 F.3d 828, 830 (8th Cir.1994), the Commissioner has the duty to fully and fairly develop the record, even if the claimant is represented by counsel. Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir.1992). If the records do not contain enough information to make an informed decision, it is the duty of the Commissioner to supplement the record. Id. Failure to do so may be reversible error. Id.
The ALJ determined that "medical evidence prior to September 30, 1996, does not support allegations of disabling symptoms due to histiocytosis." (Tr. 15). The ALJ noted that the medical records only revealed treatment for coughing, bronchitis, pleurisy, sinusitis and nasal congestion and drainage. Plaintiff's lungs were usually clear to auscultation and spirometry testing was normal. It was further noted that plaintiff only sought treatment two or three times per year, and this lack of treatment and medication were inconsistent with a disabling condition. Additionally, the ALJ noted that plaintiff continued to smoke. The ALJ also reasoned that when histiocytosis was diagnosed in June 1998, it was found not to be "far advanced." (Tr. 15-17).
While the factors noted by the ALJ may be somewhat relevant to the presence of histiocytosis on and prior to September 30, 1996, the court finds significant evidence in the record as a whole that these factors are not reliable indicators of the presence or absence of the disease and, therefore, the ALJ should have expanded the record *987 to include medical evidence about the date of onset of this disease.
Plaintiff cannot be faulted for the failure of a proper diagnosis. The record establishes that during her insured status she routinely complained of coughing, sometimes leading to chest pain, shortness of breath, and anxiety. These symptoms appear to be characteristic of histiocytosis X. (Tr. 88). Further, it appears from documents produced by plaintiff at the hearing and admitted into evidence that diffuse interstitial pulmonary fibrosis may be a result of histiocytosis X. (Tr. 89-90). Plaintiff carried a diagnosis of interstitial lung disease and interstitial fibrosis as early as April and May 1995. Further, the fact that plaintiff's lungs were consistently clear to auscultation would not necessarily lead to the conclusion that histiocytosis was not present. Dr. Pfefferkorn noted that plaintiff's chest was "amazingly clear," yet an x-ray revealed extensive pulmonary fibrosis and immediately thereafter she was diagnosed with histiocytosis X. Further, the record establishes that pulmonary function tests appear frequently to be less than adequate, in diagnosing histiocytosis as normal results are possible despite the presence of the disease. (Tr. 92, 96).
The ALJ also relies on the lack of treatment and medication. However, plaintiff complained of continuing symptoms (e.g., a cough lasting five months), obviously achieving no relief from treatment and medications prescribed. Further, the cryptic medical record notation that plaintiff's histiocytosis was "not far advanced" does little to suggest an onset date. The evidence in the record suggests that the course of histiocytosis varies widely. (Tr. 89). It is entirely possible that plaintiff did not suffer from histiocytosis on or prior to her last date insured. However, on the record before her, the ALJ erred in substituting her evaluation of the medical evidence for that of a medical expert. Associated Elec. Coop. v. Hudson, 73 F.3d 845, 848 (8th Cir.1996).
The undersigned does not agree with the defendant's assertions that the onset date of histiocytosis is immaterial and that the only issue is whether she was disabled on her last date insured. The onset date is very relevant. The ALJ denied benefits in part because there was no objective medical evidence of a disabling condition. The ALJ found only evidence of fairly routine or minor impairments of sinusitis, bronchitis, etc., and she further relied on the absence of aggressive medical treatment. If in fact plaintiff was misdiagnosed or undiagnosed and in fact suffered from histiocytosis on or prior to her date last insured, such would demean the reasoning of the ALJ, explain the relatively minor diagnoses and absence of more aggressive treatment by her physicians, and should be considered in reaching a just determination of plaintiff's claim for benefits. See Wilcutts, 143 F.3d at 1137-38 (ALJ's duty to develop the record is to ensure that deserving claimants who apply for benefits receive justice).
The undersigned also finds that the ALJ did not fully consider all of plaintiff's subjective, nonexertional complaints. While the ALJ considered plaintiff's complaints of bone pain, the ALJ failed to consider at all plaintiff's testimony that her ability to engage in substantial gainful activity was limited by her inability to tolerate mold, fumes, odors, air borne chemicals, dust, allergens, and dampness. See Burnside v. Apfel, 223 F.3d 840, 844-45 (8th Cir.2000) (necessity of working in a clean environment may constitute a nonexertional limitation that must be considered by the ALJ).
Plaintiff complained to physicians of her belief that mold and dampness caused her earliest symptoms. Her work history reflects *988 that she left jobs, such as the floral job, due to aggravation of her condition by mold, sprays, dust and allergens. She told physicians that exposure to dust and chemical fumes on previous jobs resulted in nonproductive coughs. (Tr. 287). Other evidence before the ALJ, including her testimony, suggested that cold air aggravated her condition. A letter to the ALJ authored by plaintiff suggested that it was difficult for her to deal with the cold in a chicken processing plant in which she had previously worked. (Tr. 120). Plaintiff's daily activities suggest that she stays away from fumes, chemicals, and strong odors.
Consequently, upon remand the ALJ should consider whether plaintiff had any significant nonexertional environmental limitations of the type of substantial gainful activity, if any, in which she could have engaged prior to expiration of her insured status. If the ALJ credits significant nonexertional environmental limitations, then a vocational expert should be called to testify about whether or not there are jobs in the national economy that an individual with plaintiff's credited impairments could perform. See Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir.1992) (application of medical-vocational guidelines appropriate only if claimant has exertional limitations; however, if claimant has non-exertional impairments which diminish capacity to perform full range of jobs listed in the guidelines, the Commissioner must solicit testimony of vocational expert about whether there are jobs in the national economy that plaintiff can perform).
Plaintiff also asserts that the ALJ did not properly consider her other subjective complaints, including shortness of breath and pain, under the standards set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984). The undersigned also agrees with this contention. The ALJ must specifically consider claimant's prior work record as well as observations of third parties regarding plaintiff's daily activities; the duration, frequency and intensity of the subjective complaint; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Id. at 1322. The presence or absence of objective medical evidence to support the subjective complaints is also relevant. Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir. 2000). Credibility determinations must be based on substantial evidence. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).
The ALJ did not consider plaintiff's work record "particularly helpful" to her credibility because since 1975 her annual earnings only exceeded $6,000.00 in two years. The ALJ appears to have equated earning capacity with engagement in substantial gainful activity. Further, the significance of this $6,000.00 figure is obscure. Plaintiff's work record suggests earnings in all but five of the 22 years since 1975. (Tr. 77-78). Further, the ALJ did not expressly consider that the type of employment in which plaintiff typically engaged (i.e., cashier, factory worker) is at minimum wage or piece work rates and, thus, earnings are not typically large. (Tr. 168). Additionally, the ALJ did not inquire as to any reasons why her earnings were not higher, if that is indeed a relevant measure in plaintiff's case. The record suggests several possible reasons, including pregnancy and child care issues, inability to tolerate the environmental conditions at her places of employment (Tr. 287), as well as the fact plaintiff resides in a rural area. In short, the ALJ did not demonstrate that she considered all of the evidence bearing upon plaintiff's work history.
The ALJ also discredited her unsuccessful work attempts at the floral *989 shop, noting that she continued to perform her household tasks, with the apparent inference that she could have continued working at the floral shop. But the ability to cook, clean, and engage in hobbies does not constitute substantial evidence that an individual can engage in substantial gainful activity. Burnside, 223 F.3d at 845. See also 20 C.F.R. § 404.1572(c). Further, the ALJ did not demonstrate that she considered the evidence, including that of plaintiff's neighbors, that she frequently had to rest while doing household tasks and that it took her all day to accomplish them. The need for frequent breaks and a slow work pace is not necessarily consistent with the ability to work on a daily basis in the competitive and stressful world. See Burnside, 223 F.3d at 845.
The ALJ also discounted subjective complaints because of the lack of medical treatment and medication. Depending upon the result of the ALJ's inquiry into the onset date of plaintiff's histiocytosis, the lack of more aggressive medical treatment may be the result of the rarity and difficulty in diagnosing plaintiff's condition for which plaintiff should not be held accountable. The evidence in the record suggests that the treatment for the condition is largely symptomatic. (Tr. 92). Plaintiff sought treatment for the symptoms: cough, shortness of breath, and anxiety. When treatment was sought she reported that the symptoms were long standing. As discussed above, the fact that her lungs were clear and pulmonary function tests normal do not detract from her credibility, as such are possible with this disease.
The ALJ also discredited her subjective complaints because she continued to smoke noting that cessation had stabilized her disease in October 1998. The Commissioner ignored the subsequent evidence that in June 1999 she began at least a two-month course of chemotherapy after a diagnosis of eosinophilic granuloma with extensive lung involvement, genital involvement, and possible lymph node involvement, suggesting that the disease was not stabilized in October 1998 with smoking cessation. Evidence submitted by plaintiff at the hearing suggests that stopping smoking "may" improve response to treatment. (Tr. 89). Dr. Ahmad was uncertain of the etiology of the disease. (Tr. 269-74). There was no inquiry into why plaintiff had not ceased smoking at an earlier date despite the recommendation to do so. See Burnside, 223 F.3d at 843-44 (before a claimant is denied benefits for failing to stop smoking on physician's recommendation, inquiry must be conducted into the circumstances surrounding the failure and a determination must be made on the basis of evidence in the record whether quitting will restore claimant's ability to work or sufficiently improve condition).

Conclusion
Accordingly, for the foregoing reasons, the undersigned concludes that the decision of the Commissioner denying plaintiff disability insurance benefits is not based upon substantial evidence. The appeal of plaintiff Karen Rasor from the denial of benefits under Title II of the Social Security Act is sustained. The final decision of the Commissioner of Social Security is reversed and the case remanded under Sentence 4 of 42 U.S.C. § 405(g) for further proceedings.
An appropriate judgment is entered herewith.

JUDGMENT
This action is before the court upon the complaint of the plaintiff for review of the final decision of the Commissioner of Social Security denying disability benefits to *990 plaintiff. The parties consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c). In accordance with the memorandum filed herewith,
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the final decision of the defendant Commissioner of Social Security denying benefits to plaintiff Karen S. Rasor is reversed. This action is remanded to the defendant Commissioner of Social Security under Sentence 4 of 42 U.S.C. § 405(g) for further proceedings.
NOTES
[1] Larry G. Massanari became the Acting Commissioner of Social Security on March 29, 2001, and is substituted for William A. Halter as the defendant in this suit. Fed. R.Civ.P. 25(d)(1).
[2] The presence of gas or air in the pleural cavity. Stedman's Medical Dictionary (25th ed.1990) at 1127.
[3] A lesion which occurs chiefly as a solitary focus in one bone, although multiple involvement is sometimes observed and similar foci may develop in the lung. Stedman's Medical Dictionary (25th ed.1990) at 668.